UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

CHRISTOPHER J. MCCOY,

Plaintiff,

vs.                                                    Case No. 8:05-CV-924-T-27MAP

GEICO GENERAL INSURANCE CO.
c/o EMPLOYERS UNITY INC., a
Colorado Corporation,

Defendant.

_____/

## ORDER

**BEFORE THE COURT** is Defendant's Motion for Summary Judgment (Dkt. 22), to which

Plaintiff has responded in opposition (Dkt. 27).   Upon consideration, Defendant's motion is

GRANTED.

### *Background* [1]

In August 2004, Defendant GEICO General Insurance Company ("Defendant") fired Plaintiff

for what it alleges were continuous violations of multiple company policies.   In the instant action,

Plaintiff contends that his termination and Defendant's failure to accommodate his alleged

disabilities -- frequent urination and migraine headaches -- were in violation of the Americans with

Disabilities Act (ADA), 42 U.S.C. 12111 *et seq.*, and the Florida Civil Rights Act of 1992 (FCRA),

Fla. Stat. § 760.01 *et seq.*

Plaintiff began working for Defendant on February 14, 2000 in its Lakeland, Florida facility.

(Pl. Dep. at 41).   He ultimately attained the position of Service Representative IV and was

_____

[1] Plaintiff has not submitted a statement of undisputed facts and does not contest the facts as set forth by
Defendant.

responsible for fielding telephone calls from existing or prospective customers in order to service and sell GEICO products.  (Brown Aff. ¶ 5).  He was also responsible for building Defendant's customer base and maintaining customer satisfaction through efficient customer service.  *Id.*  During his pre-employment health evaluation on December 28, 1999, Plaintiff denied the need for accommodations and denied that he had any limitations or restrictions.  (Dkt. 33, Exh. 7).

a.      *Migraine headaches*

Plaintiff alleges that he began experiencing migraine headaches in January or February 2004, about once a week to the best of his recollection.  (Pl. Dep. at 160-61).  Plaintiff alleges that the headaches ended "a couple of months after being terminated."  (Dkt. 27-3, Pl. Dep. Errata, l. 14; Pl. Dep. at 159).  When he had a migraine, Plaintiff left work and would not return until the following day or until the next day.  (Pl. Dep. at 161-62; 165-67).  Plaintiff's affidavit states that:

> Those headaches were of such strength and duration that it caused me to miss work day [*sic*], though when I did not have such a headache, I could function in the job quite well, except for my need to take more frequent breaks. . . . [S]ometimes I was so sick from the headache that I could not move to call in or to answer the telephone. The pain of the headaches would cause me to be nauseous sometimes, it always made me feel weak, sensitive to light and sound, and the most I could do when the headaches were raging was to lie down in a quiet, darkened room, and try to sleep until it passed. (Pl. Aff. ¶¶ 8-10).

Plaintiff began seeking treatment for his migraines from his primary care physician, Dr. Jose Martinez, in late March 2004.  (Pl. Dep. 203-04; Dkt. 32, Exh. 31).  After submitting paperwork from this visit, Plaintiff was approved for leave for his migraines under the Family Medical Leave Act (FMLA).  *(Id.*; Pl. Dep. at 81).  Plaintiff does not recall being denied permission to leave work when he suffered from a migraine. (Pl. Dep. at 164-65; 189-90).  During a follow-up appointment on May 11, 2004, Dr. Martinez indicated that Plaintiff was able to perform the essential functions of his job.  (Dkt. 32, Exh. 32).

b.      *Frequent urination*

Plaintiff alleges that he has suffered from a frequent urination problem for most of his life, although he did not seek medical treatment for this condition until 2004. (Pl. Dep. at 65-66). Plaintiff testified in his deposition that his condition had no effect on his ability to think or to do his job competently. (Pl. Dep. at 74). He also testified that he engaged in normal social activities such as going to the movies and playing sports, that he had a normal sex life, and that he was able to sleep, eat, and dress himself normally. (Pl. Dep. at 74- 75). He was unable to think of any restrictions on his physical or mental activities due to his frequent urination condition. (Pl. Dep. 75). However, Plaintiff's affidavit states:

> I always plan even short drives with the need to use the bathroom, I must often stop, I have to stop two or sometimes more times in traveling between Tampa and Lakeland or Lakeland and Plant City or anywhere which is more than 5 minutes from my starting point. The need is not constant, it is variable, but I cannot predict when it will hit. I don't go on vacations or even day trips to locations like beaches that have no restroom facilities available. (Pl. Aff., Dkt. 27-6, ¶¶ 4-5).

From his hiring until approximately April 30, 2004, Plaintiff states that he was permitted to use the restroom at any time. (Pl. Dep. at 194). However, because he exceeded his break time on April 30, 2004, Plaintiff's immediate supervisor, Ms. Toni Kaipainen, asked him provide medical documentation of his condition, which he attributed to a small bladder. (Pl. Dep. at 194-95; Kaipainen Aff. ¶ 5). Ms. Lori Haase, Defendant's nurse, states that such documentation is necessary in order to effectively tailor accommodations to an employee's needs. (Haase Aff. ¶ 4).

On June 2, 2004, Plaintiff provided a note from Dr. Martinez, stating that Plaintiff had an appointment with a urologist on July 6, 2004. (Pl. Dep. at 224; Dkt. 32, Exh. 36). The note did not contain any requests or suggestions regarding accommodations. *Id.* On June 21, 2004, Ms. Haase asked Plaintiff to provide medical documentation from a urologist that specifically described his

3

condition and suggested specific accommodations. (Haase Aff. ¶ 6, Ex. A). On July 2, 2004, Defendant's Human Resources Manager, Diana Brown, also asked Plaintiff to provide this information. (Brown Aff. ¶ 10). During this meeting, Plaintiff explained that his need to frequently urinate was due in part to the amount of water he drank. *Id.*

On July 9, 2004, Plaintiff gave Ms. Haase a note from Dr. Martinez that requested "any consideration you could extend during the time that he is undergoing evaluations before more specific diagnoses are given." (Pl. Dep. at 236-38; Dkt. 32, Exh. 40; Haase Aff. ¶ 7). Ms. Haase told Plaintiff that Dr. Martinez's note was too general and was not helpful in suggesting reasonable accommodations because it did not suggest specific time frames for additional breaks or other accommodations. (Haase Aff. ¶ 7).

On August 6, 2004, Plaintiff provided Ms. Haase with records from Dr. Sean Tirney, his urologist, who recommended that Plaintiff be allowed to use the bathroom on an hour and a half to two hour basis. (Haase Aff. ¶ 9, Ex. B). Dr. Tirney's report stated that "it is quite possible that his symptoms may be related to an anatomically smaller bladder than normal, which would contribute to his urinary frequency, slightly higher than average." *Id.* The report also noted that Plaintiff's "slightly enlarged prostrate may be contributing to his symptom" and prescribed Uroxatral. *Id.*

Plaintiff was terminated one week later, on August 13, 2004, for what Defendant alleges were policy violations. (Brown Aff. ¶ 12). These policy violations are summarized below.

c.    *Employment policy violations*

Plaintiff received a copy of the Lakeland Associate Handbook ("Handbook") on February 21, 2000, and he received a revised edition on June 29, 2004. (Dkt. 32, Exhs. 2, 3, 6). Plaintiff also received a list of "Associate Expectations." (Dkt. 32, Exh. 4). The Handbook, as well as the form that Plaintiff signed acknowledging that he received the Handbook, stated that violation of any of

Defendant's policies could result in "performance management," up to and including termination. (Dkt. 32, Exh. 3 at 33; Exh. 6).  During the time of Plaintiff's alleged violations, Plaintiff was supervised by Kimberly Goff, until Ms. Kaipainen took over as his supervisor in December 2003. (Kaipainen Aff. ¶ 3; Pl. Depo. at 163).

1.     *Telephone policy violations*

Defendant alleges that Plaintiff violated Defendant's policy against putting callers on hold for more than three minutes ("excessive hold policy"), the policy prohibiting making and receiving of personal phone calls while on duty ("personal call policy")[2], and the "blind transfer policy," which prohibits transferring a caller without providing the receiving associate with information about the call.[3]

On July 28, 2003, Plaintiff violated the excessive hold policy, personal call policy, and blind transfer policy. (Pl. Dep. at 127; Dkt. 32, Exhs. 20, 21).  On August 11, 2003, Plaintiff violated the personal call policy and excessive hold policy three times during a call.  (Dkt. 32, Exh. 22).  Ms. Goff had a discussion with Plaintiff regarding proper use of the phones.  (Pl. Dep. 130; Exh. 22). On September 9, 2003, Plaintiff again violated the excessive hold policy.  (Dkt. 32, Exh. 22).  On October 11, 2003, Plaintiff used his cell phone to text message another associate in violation of the personal call policy.  (Pl. Dep. at 120-21; Dkt. 32, Exh. 23).  On November 11, 2003, Plaintiff was issued a written warning for this incident and the August 11, 2003 incident, which he refused to sign. (Pl. Depo. at 131; Dkt. 32, Exhs. 23, 24).  The warning stated that any further violations may result

---

[2] The Handbook states as its "Cell Phone Policy": "While working, associates may not receive or make personal phone calls on their cellular phones.  All personal cellular phones and pagers must be placed on a silent notification system while the associate is in the work area.  Unless it is an emergency, associates may not return a cellular message or page until they are on break, at lunch, or off work."  (Dkt. 32, Exh. 3 at 26).

[3] The Handbook states: "Never blindly transfer a call to another associate or supervisor. . . . Follow appropriate transfer call procedures: 1. Announce the call or advise the customer of a hold condition, 2. Ensure proper connection, 3. Make yourself available for the next call."  (Dkt. 32, Exh. 3 at 10).

in further disciplinary action, up to and including termination.  (Dkt. 32, Exh. 23).[4]

On May 3, 2004, Plaintiff signed a memorandum stating that he understood the importance of not leaving customers on excessive holds.  (Dkt. 32, Exh. 25).  On June 28, 2004, Ms. Kaipainen had a verbal "coaching session" with Plaintiff that addressed the fact that he continued to leave customers on hold for longer than three minutes.  (Kaipainen Aff. ¶ 16; Dkt. 32, Exh. 16).  At that meeting, Plaintiff refused to sign a memorandum similar to the May 3, 2004 memorandum that he had already signed.  (Kaipainen Aff., Exh. A).

2.    *Call-in policy violations*

The Handbook set forth Defendant's "call-in policy," which requires an employee to personally speak with a supervisor within the first thirty minutes of the shift for which the employee is absent. (Dkt. 32, Exh. 3 at 28).  On February 22, 2000, Plaintiff signed a separate memorandum that explained the call-in policy. (Dkt. 32, Exh. 5).  Defendant alleges that Plaintiff violated its call-in policy on a number of dates between May and July 2004.

On May 20, 2004 and May 27, 2004, Plaintiff violated the call-in policy, and Ms. Kaipainen advised that he must personally speak with a supervisor and not simply leave a voicemail.  (Pl. Dep. at 94; Dkt. 32, Exh. 8).  He was given the names of two additional supervisors, Yolanda Marrero and Jane Mays, who he could call in the event Ms. Kaipainen was unavailable. (Pl. Dep. at 95-96; Dkt. 32, Exh. 8; Kaipainen Aff. ¶ 13).

On June 3, 10, 11, and 17, 2004, Plaintiff again left messages on voicemail rather than speaking personally to supervisors.  (Pl. Dep. at 96- 101; Dkt. 32, Exhs. 9-11).  On June 3, 10, and 11, Ms. Marrero and Jared Surrency, another supervisor, called Plaintiff back and reminded him of

---

[4] The Handbook states that a written warning is "serious action taken by the supervisor only when prior discussions have not been effective." (Dkt. 32, Exh. 3 at 32).

the call-in procedures. (Dkt. 32, Exhs. 8-11). On June 18, 2004, Plaintiff met with his manager, Mary Baer, and Mr. Surrency to discuss the continuing violations. (Pl. Dep. at 102; Dkt. 32, Exhs. 12, 13). Ms. Baer gave him a list of supervisors and their phone numbers. (Pl. Dep. at 102; Dkt. 32, Exhs. 12, 13; Surrency Aff. ¶ 7). Ms. Baer explained that failure to abide by the call-in policy would result in a written warning. (Dkt. 32, Exhs. 12, 13).

On June 27, 2004, Plaintiff failed to comply with the call-in procedure. (Pl. Dep. at 106; Dkt. 32, Exh. 15). On June 28, 2004, Ms. Kaipainen issued a written warning for this and the four previous violations. (*Id.*) The warning stated that future violations would lead to further disciplinary action, up to and including termination. (*Id.*)

On July 10, 2004, Plaintiff left a message for Mr. Surrency rather than personally speaking with a supervisor. (Pl. Dep. at 111; Dkt. 32, Exh. 17; Surrency Aff. ¶ 8). Plaintiff violated the call-in procedure again on July 15, 2004 and July 22, 2004. (Pl. Dep. at 112-13; Dkt. 32, Exh. 18). On July 22, 2004, Plaintiff met with Ms. Kaipainen and Ms. Brown to discuss his continued violations. (Dkt. 32, Ex. 19). He was warned that his next violation would be a terminable offense. (Dkt. 32, Exh. 19; Brown Aff. ¶ 9; Kaipainen Aff. ¶ 15).

3. *Tardiness policy violations*

Defendant alleges that Plaintiff violated its tardiness policy on several days between April and August 2004. On April 30, 2004, Plaintiff exceeded his break time by 15 minutes. (Dkt. 32, Exhs. 8, 33; Kaipainen Aff. ¶ 5).[5] As noted above, after this violation, Ms. Kaipainen requested that Plaintiff provide medical documentation of his condition so that Defendant could accommodate his needs. *Id.* On May 11, 2004, Plaintiff exceeded his 45-minute lunch break by 13 minutes. (Pl. Dep.

---

[5] Plaintiff clarified in his deposition that this did not mean that he took a thirty-minute break rather than a fifteen-minute break, but that he took an unauthorized fifteen minutes worth of break time at some time that day. (Pl. Depo. at 216, l. 3 - 217, l. 1).

at 219; Dkt. 32, Exhs. 8, 33).  On May 24, 2004, he was given a written warning that further

violations could result in disciplinary action up to and including termination. (Pl. Dep. at 213; Dkt.

32, Exh. 33).

On June 18, 2004, Mr. Surrency observed Plaintiff taking a break and talking on his cell

phone. (Surrency Aff. ¶ 9; Pl. Dep. at 228; Dkt. 32, Exh. 39).  Plaintiff told Mr. Surrency he was

cleared to take additional breaks because he had brought a note to health services. (*Id.*)   Mr.

Surrency said there was no such note in his file, and Plaintiff returned to his desk. (*Id.*)

On August 3, Plaintiff exceeded his lunch break by seven minutes. (Kaipainen Aff. ¶ 8).  On

August 5, 2004, Plaintiff exceeded his bathroom break by 6 minutes and his lunch break by 3

minutes. *Id.* He also had a ten minute "auto sign out," which meant that his time was not accounted

for, in violation of Defendant's policy. (Kaipainen Aff. ¶¶ 8-9).  Plaintiff signed out from his

workstation for an additional 35 minutes to meet with Ms. Haase, although they did not meet that

day. (Kaipainen Aff. ¶ 9; Haase Aff. ¶ 8; Pl. Dep. at 246).[6]

Finally, on August 6, 2004, Defendant alleges that Plaintiff exceeded his lunch break by 3

minutes, his bathroom break by 4 minutes, and had an authorized signout for 13 minutes. (Kaipainen

Aff. ¶ 11).  Plaintiff also signed out from his workstation for 47 minutes in order to meet with Ms.

Haase and to watch his girlfriend in an office play.[7] (Kaipainen Aff. ¶ 11).  When Ms. Baer saw him

standing in line waiting to attend the play, she sent him back to work. (Pl. Dep. at 248-49).

_____

[6] To the extent Defendant suggests that Plaintiff was not waiting for Ms. Haase this entire time as he alleged in his deposition (Kaipainen ¶¶ 9-10), the Court resolves this factual dispute in Plaintiff's favor and finds that he was.

[7] Ms. Haase states that she did not meet with Plaintiff on August 6th and had previously told him she would be unavailable to meet with him. (Haase Aff. ¶¶ 8-9).  Again, to the extent Defendant is suggesting that Plaintiff was not seeking to meet with Ms. Haase, this dispute is resolved in Plaintiff's favor.  However, the Court notes that Plaintiff stated that he spent "most of the time" waiting in line to get to the play. (Pl. Dep. at 248).

d.   *Plaintiff's termination*

On July 12, 2004, Ms. Kaipainen recommended Plaintiff's termination based on the July 10, 2004 violation of the call-in procedure, which occurred after Plaintiff's third written warning on June 28, 2004 cautioned that any subsequent violations of the policy could lead to termination. (Kaipainen Aff. ¶ 17, Exh. B).   Ms. Kaipainen's supervisor, Robin Burdick, agreed with the recommendation, but it was put on hold for an unspecified reason.  *Id.*

On August 12, 2004, Ms. Kaipainen again recommended that Plaintiff be terminated. (Kaipainen Aff. ¶ 18, Exh. C.)  Ms. Kaipainen states that the specific triggering events were Plaintiff's unauthorized breaks on August 5th and August 6th, following the written warning on May 24, 2004.  *Id*.  Plaintiff was terminated on August 13, 2004 for what Defendant alleges were his consistent policy and procedure violations.  (Brown Aff. ¶ 12).

### *Standard*

Summary judgment is proper if following discovery, the pleadings, depositions, answers to interrogatories, affidavits and admissions on file show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); Fed. R. Civ. P. 56.  "An issue of fact is 'material' if, under the applicable substantive law, it might affect the outcome of the case." *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259-60 (11th Cir. 2004).  "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Id.* at 1260.  All the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *Jackson v. BellSouth Telecomms.*, 372 F.3d 1250, 1280 (11th Cir. 2004).

Once a party properly makes a summary judgment motion by demonstrating the absence of a

genuine issue of material fact, whether or not accompanied by affidavits, the nonmoving party must go beyond the pleadings through the use of affidavits, depositions, answers to interrogatories and admissions on file, and designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 323-24.  Plaintiff's evidence must be significantly probative to support the claims. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The Court will not weigh the evidence or make findings of fact. *Anderson*, 477 U.S. at 249; *Morrison v. Amway Corp.*, 323 F.3d 920, 924 (11th Cir. 2003).  Rather, the Court's role is limited to deciding whether there is sufficient evidence upon which a reasonable juror could find for the non-moving party. *Id.*

### Discussion[8]

Plaintiff brings his claims pursuant to the Americans with Disabilities Act (ADA), 42 U.S.C. 12111 *et seq.*, and the Florida Civil Rights Act of 1992 (FCRA), Fla. Stat. § 760.01 *et seq.*  Because federal case law interpreting the ADA is applicable to claims arising under the FCRA, Plaintiff's two causes of action are analyzed simultaneously. *Reis v. Univ. City Develop. Partners, Ltd.*, 442 F. Supp. 2d 1238, 1243 (M.D.Fla. 2006) (citing *Wimberly v. Sec. Tech. Group, Inc.,* 866 So.2d 146, 147 (Fla. 4th DCA 2004).

The ADA prohibits discrimination "against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).  Although neither Plaintiff's Complaint nor his response to the motion for summary judgment clearly set forth his claims, Plaintiff appears to be

---

[8] Apart from bare recitation of standards, Plaintiff has cited no case law in support of his opposition to Defendant's motion for summary judgment.

complaining that Defendant discriminated against him by firing him for violations of company policy. Plaintiff does not dispute that he violated the policies, but instead argues that the violations were caused by his disabilities and that the policies were enforced against him but not other employees. Thus, Plaintiff is essentially arguing that Defendant failed to make reasonable accommodations for his disability and that his ultimate termination was the result of disparate treatment.

**1.      Burdens of Proof**

*a.      Disparate treatment/termination claim*

A disparate treatment claim is evaluated under the traditional *McDonnell Douglas* burden-shifting framework. *Durley v. APAC, Inc.*, 236 F.3d 651, 657 (11th Cir. 2000). Under this approach, the employee must first establish a prima facie case of discrimination. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003). The burden then shifts to the employer to articulate a legitimate non-discriminatory reason for the adverse employment action. *Id.* If the employer meets this burden of production, the employee may still prove disparate treatment, for instance, by demonstrating the employer's reason is pretextual. *Id.*

*b.      Failure to accommodate claim*

Discrimination under the ADA includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability." 42 U.S.C. § 12112(b)(5)(A). In a claim for failure to make reasonable accommodations, the traditional *McDonnell Douglas* burden-shifting is modified. *Fenney v. Dakota, Minn. & E. R. Co.*, 327 F.3d 707, 712 (8th Cir. 2003). In addition to setting forth the prima facie case, Plaintiff must identify a reasonable accommodation that would allow him to perform the job. *Terrell v. USAir*, 132 F.3d 621, 624 (11th Cir. 1998). Once the plaintiff has met this burden, the defendant employer may rebut the

claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer. *Id.*

## 2. Prima Facie Case

To establish a prima facie case of employment discrimination under the ADA -- under either theory -- a plaintiff must demonstrate that: (1) he has a disability; (2) he is a "qualified individual;" and (3) the defendant unlawfully discriminated against him because of the disability. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1225-26 (11th Cir. 2005). Defendant does not dispute that Plaintiff was an otherwise "qualified individual,"[9] thus meeting the second prong. (Dkt. 22 at 14).

A determination of whether a person is disabled is an individualized inquiry performed on a case-by-case basis and "is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999); 29 CFR pt. 1630, App. 1630.2(j).[10] An individual is "disabled" within the meaning of the ADA when he possesses any one of the following: (1) a physical or mental impairment that substantially limits one or more of the major life activities; (2) a record of such an impairment; or (3) is regarded as having such an impairment. *Id.* § 12102(2). A "major life activity" includes "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."[11] 29 CFR § 1630.2(i).

---

[9] A qualified individual is "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position such individual holds or desires, and who, with or without reasonable accommodation, can perform the essential functions of such position." 29 C.F.R. § 1630.2(m).

[10] Although the EEOC's administrative interpretations are not binding, they "do constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 65 (1986).

[11] The Eleventh Circuit has consistently treated working as a major life activity. *D'Angelo v. ConAgra Foods, Inc.*, 422 F.3d 1220, 1226-27 (11th Cir. 2005).

Plaintiff testified in his deposition that his frequent urination condition had no effect on his ability to think or to do his job competently. (Pl. Dep. at 74). He also testified that he engaged in normal social activities such as going to the movies and playing sports, that he had a normal sex life, and that he was able to sleep, eat, and dress himself normally. (Pl. Dep at 74-75). He was unable to think of any restrictions on his physical or mental activities due to his frequent urination condition. (Pl. Dep. at 75). However, Plaintiff's affidavit does allege that he must stop to use the bathroom when driving, even on short trips, and that he does not go to locations where no restroom facilities available. (Pl. Aff., ¶¶ 4-5). As for Plaintiff's migraine headaches, his affidavit states that:

> Those headaches were of such strength and duration that it caused me to miss work day, though when I did not have such a headache, I could function in the job quite well, except for my need to take more frequent breaks. . . . [S]ometimes I was so sick from the headache that I could not move to call in or to answer the telephone. The pain of the headaches would cause me to be nauseous sometimes, it always made me feel weak, sensitive to light and sound, and the most I could do when the headaches were raging was to lie down in a quiet, darkened room, and try to sleep until it passed. (Pl. Aff. ¶¶ 8-10).

Plaintiff also testified in his deposition that he thought there was a connection between the performance pressure that Ms. Kaipainen placed on him and his migraines. (Pl. Depo. at 168).[12]

Assuming that Plaintiff's migraine headaches and frequent urination constitute "physical impairments," Plaintiff has failed to show that these impairments "substantially limit" any major life activity, such as working.[13]   An individual's ability to work is substantially limited only when the individual is:

---

[12] Although Plaintiff's medical records are limited, this does not preclude his establishment of a disability. A plaintiff's own testimony may be sufficient when the alleged impairment is within the comprehension of a jury. *Katz v. City Metal Co.,* 87 F.3d 26, 32 (1st Cir.1996); *Marinelli v. City of Erie,* 216 F.3d 354, 360 (3d Cir.2000). However, a lack of medical testimony may be considered as cutting against a claim of disability. *Id.*

[13] To the extent Plaintiff's statements could be read to allege that his frequent urination affects the major life activity of "driving," the Eleventh Circuit has held that driving is not a major life activity. *Chenoweth v.Hillsborough County,* 250 F.3d 1328, 1329-30 (11th Cir. 2001).

significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working. 29 C.F.R. § 1630.2(j)(3)(i).

The Supreme Court has noted that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 197 (2002).

The regulations outline several specific factors to be considered in assessing whether an individual's ability to work is substantially limited:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes). 29 C.F.R. § 1630.2(j)(3)(ii).

Other, more general factors are also considered, such as: 1) the nature and severity of the impairment; 2) the duration or expected duration of the impairment; and 3) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment. 29 C.F.R. § 1630.2(j)(2)(i)-(iii).

Turning first to the more general factors, Plaintiff's testimony indicates that his migraines were severe when they occurred, but that they were limited in duration, beginning at the earliest in January 2004 and ending, at the latest, in October 2004. *Toyota Motor Mfg., Kentucky, Inc.*, 534 U.S. at 198 ("[t]he impairment's impact must also be permanent or long term"); 29 CFR §

1630.2(j)(2)(iii); *Williams v. Stark County Bd. of County Com'rs*, 7 Fed. Appx. 441, 447 (6th Cir. 2001) (finding that migraines were not a disability where medical opinions in the record did not regard them as a permanent condition or one causing significant functional impairment). Although Plaintiff's migraines occurred approximately once a week, he was able to perform his work when he did not have a migraine. By contrast, the Court accepts, based on Plaintiff's testimony, that his frequent urination was a permanent condition. However, it was not severe, given that Plaintiff's ultimate requested accommodation was to visit the restroom every hour and a half to two hours.

In addition, Plaintiff has failed to show that he was unable to perform "a broad range of jobs" or a "class of jobs." Although a plaintiff "is not required to provide a comprehensive list of jobs which she cannot perform, the person must provide some evidence beyond the mere existence and impact of a physical impairment to survive summary judgment." *Swain v. Hillsborough County Sch. Bd.*, 146 F.3d 855, 858 (11th Cir. 1998) (finding that teacher with incontinence problems had not demonstrated her incontinence substantially limited her ability to work); *Cash v. Smith*, 231 F.3d 1301, 1306 (11th Cir. 2000) (despite seizures, migraines, diabetes, depression and absenteeism at work, plaintiff was not disabled and did not have a disability where her deposition testimony stated she was "an active person who walks, swims, fishes, and had held a 40-hour-a-week job for the previous eight years"). Moreover, Plaintiff's deposition testimony and ability to hold a job for four years with Defendant "belie any claim that [he] cannot perform a broad range or class of jobs." *Id.*

Finally, there is no evidence that Defendant "regarded" Plaintiff as being substantially limited in the major life activity of working. As explained by the Supreme Court:

> There are two apparent ways in which individuals may fall within this statutory definition: (1) a covered entity mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an actual, nonlimiting impairment substantially limits one or more major life activities. In both cases, it is necessary that a covered entity

15

> entertain misperceptions about the individual-it must believe either that one has a substantially limiting impairment that one does not have or that one has a substantially limiting impairment when, in fact, the impairment is not so limiting. These misperceptions often 'resul[t] from stereotypic assumptions not truly indicative of ⋯ individual ability.' *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 489 (1999).

*see also D'Angelo v. Conagra Foods, Inc.*, 422 F.3d 1220, 1228 (11th Cir. 2005). Plaintiff has simply introduced no evidence that Defendant entertained a misperception that Plaintiff was disabled or that it possessed any stereotypic assumptions about Plaintiff. *Cf. D'Angelo*, 422 F.3d at 1228 n.5 (question of fact existed as to whether supervisors regarded plaintiff as disabled where they testified that they understood Plaintiff's condition to be much more limiting that it actually was due to a confusingly-worded doctor's note). In contrast to other cases in which the employer was found to have regarded an employee as substantially disabled, Defendant continued to employ Plaintiff in a job utilizing his skills. *Compare Cash*, 231 F.3d at 1306-07 (plaintiff failed to produce any evidence that employer regarded her as substantially limited where defendant was employing plaintiff in a job utilizing her skills) *with Rossbach v. City of Miami*, 371 F.3d 1354, 1360 (11th Cir. 2004) (evidence suggested that plaintiffs were regarded as disabled where they were placed on "light duty," a term reserved for disabled employees).

The Court notes that an employer's request that an employee undergo a physical evaluation, or an employer's willingness to grant an employee medical leave, do not suggest that the employer regards the employee as substantially limited in the major life activity of working. *Sullivan v. River Valley Sch. Dist.*, 197 F.3d 804, 811 (6th Cir. 1999); *compare Hilburn v. Murata Elec. N. Am., Inc.*, 181 F.3d 1220, 1230 (11th Cir. 1999) (employer allowing plaintiff 180 days of leave over four years did not support finding employer perceived plaintiff as having a disability), *with Pritchard v. S. Co. Servs.*, 92 F.3d 1130, 1134 (11th Cir.) (finding issue of material fact as to whether employer regarded plaintiff as disabled where it placed plaintiff on "disability leave" for over a year). To hold otherwise

would discourage employers from making good-faith inquiries into an employee's needs and would potentially discourage medical leave for impairments not rising to the level of a substantial limitation.

In summary, Plaintiff has failed to show that he has a disability within the meaning of the ADA. Plaintiff has not introduced sufficient evidence to show that he is substantially limited or significantly restricted in any major life activity, including working. For this reason, he has failed to present a prima facie case and both of his claims accordingly fail.

As set forth below, Plaintiff's claims also fail because there is no evidence that Defendant fired him "because of" his disability. Although this is also part of the prima facie case, the Court discusses the evidence, for the sake of clarity, in terms of a "legitimate non-discriminatory reason" and "pretext."

**3.     Termination Claim**

*a.     Legitimate non-discriminatory reason*

Defendant has clearly articulated a legitimate, non-discriminatory reason for Plaintiff's termination. As described in detail above, beginning in July 2003, Plaintiff engaged in a series of documented violations of multiple company policies. Specifically, Plaintiff violated the following policies on the following dates: (1) the telephone policies on July 28, 2003, August 11, 2003, October 11, 2003, and June 18, 2004; (2) the call-in policy on May 20, May 27, June 3, June 10, June 11, June 17, June 27, July 10 and July 22, 2004; and (3) the tardiness policy on April 30, May 11, June 18, August 3, August 5, and August 6, 2004. In addition to verbal warnings, on November 13, 2003, May 24, 2004, and June 28, 2004, Plaintiff received official written warnings that future violations of company policies could result in further disciplinary action, up to and including termination.

Defendant has alleged that the specific triggering events for Plaintiff's termination were his violations of the tardiness policy in early August, specifically, exceeding lunch and break time, having unauthorized sign outs, and the 35-minute and 47-minute unauthorized absences on August 5 and August 6, 2004. (Kaipainen Aff. ¶ 18, Exh. C). Ms. Kaipainen and Ms. Brown also state that Plaintiff's overall history of policy and procedure violations justified his termination. (Kaipainen Aff. ¶ 18; Brown Aff. ¶ 12). Based on the foregoing, Defendant has adequately met its burden by alleging, with supporting documentation, that Plaintiff's repeated violations of company policies were the legitimate, non-discriminatory reason for his termination.

*b.*     *Pretext*

Plaintiff has attempted to show pretext by vaguely alleging that other employees were not disciplined for violating company policy. (Pl. Aff. ¶ 13; Depo. at 23-24, 26). The only employee specifically identified is Plaintiff's girlfriend, Taryn Sicks, also a former GEICO employee, who submitted an affidavit stating that she was not disciplined for exceeding her breaks, not following the call-in procedure, and for putting callers on hold. (Sicks Aff., Dkt. 27-5, ¶¶ 3-7; Pl. Depo. at 125-27). However, no details are given as to the nature and frequency of Ms. Sicks' alleged violations, and no allegation is made that she received repeated warnings from her supervisors about the specific consequences of her behavior. Moreover, the documents attached to Ms. Sicks' affidavit state that her supervisor was Kristy Hansen, who was never Plaintiff's supervisor. As the Eleventh Circuit has acknowledged in the Title VII context, "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination" because different supervisors may choose to enforce policies in different ways. *Silvera v. Orange County Sch. Bd.,* 244 F.3d 1253,

1261 n. 5 (11th Cir.2001).[14]

The Court is mindful that a policy, such as a call-in procedure, could be so onerous as to punish employees who otherwise comply with the prerequisites to obtain medical leave. However, Defendant's call-in policy was not unreasonable -- it required only that an employee speak personally to a supervisor within the first 30 minutes of the employee's scheduled shift so that the supervisor would be immediately informed of the employee's absence. Plaintiff has not explained why he was not able to speak with a supervisor as the call-in procedure required, but was able to leave a voicemail for a supervisor. Plaintiff does not allege that he ever attempted to call a second supervisor, as he had been requested to do. Plaintiff also does not allege that he requested modification of the call-in procedure due to his migraines.

Moreover, Plaintiff does not allege that his violations of the excessive hold policy, the blind transfer policy and the personal call policy were related to his frequent urination and migraine headaches. Similarly, Plaintiff has not alleged that his 35-minute and 47-minute unauthorized absences, which are alleged to have been among the triggering events for his termination, were caused by his medical problems. Plaintiff has provided no explanation for why he was unable to return from a forty-five minute lunch break on time, given that his urination problem was frequency, not difficulty, in urinating.

Had Plaintiff been fired solely for exceeding his thirty minutes of scheduled break time, this could be susceptible to a prextext argument, because Plaintiff alleges that he exceeded his break time in order to accommodate his need to visit the restroom. However, because of Plaintiff's long-

---

[14] Indeed, Plaintiff stated in his deposition that "Supervisors did things differently. Some supervisors' procedures were one way, some supervisors' were another way." (Pl. Depo. at 56). Plaintiff alleges that policies began to be enforced against him in January 2004, with the arrival of Ms. Kaipainen as his supervisor. (*Id.* at 69).

19

standing and continuous policy violations that are unrelated to his medical conditions, the Court cannot find that Plaintiff has put forth sufficient evidence that Defendant's stated reason for firing him was pretextual, or that Defendant possessed any discriminatory animus.  Nor does the proximity between Plaintiff's request for accommodations on August 6th and his firing on August 13th provide evidence of discriminatory animus sufficient to override Defendant's stated reasons for termination. *See also Miller v. Gen. Wholesale Co., Inc.*, 101 F. Supp. 2d 1374, 1379 (N.D. Ga. 2000), *aff'd* 254 F.3d 74 (11th Cir. 2001) (no discriminatory animus where employer fired employee eleven days after a conversation about his disability and his ability to work); *cf. Gamba v. City of Sunrise*, 157 Fed. Appx. 112, 113 (11th Cir. 2005) ("The FMLA does not insulate an employee who has requested medical leave from being terminated for poor performance").

Based on the foregoing, Defendant's motion for summary judgment is granted on Plaintiff's claim for disparate treatment in violation of the ADA and FCRA.

**4.      Failure to Accommodate Claim**

In order to prevail on a failure to accommodate claim, in addition to presenting a prima facie case, Plaintiff must identify a reasonable accommodation. *Terrell*, 132 F.3d at 624.  Once the plaintiff has met his burden of proving that reasonable accommodations exist, the employer may rebut the claim by presenting evidence that the plaintiff's requested accommodation imposes an undue hardship on the employer.  *Id.*; *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997). Although Plaintiff failed to prove his prima facie case, as set forth above, the Court analyzes the failure to accommodate claim as an additional ground for disposition.

Plaintiff admits that he received FLMA leave for his migraines each time that he requested it.  Although Plaintiff states in his affidavit that applying for the FMLA leave was not an easy process and it "was as if they did not want me to have it," he makes no specific allegations to

buttress this speculative statement. Thus, Plaintiff's allegations regarding a failure to accommodate seem to center around Defendant's alleged failure to accommodate his frequent urination condition.

When an employee requests an accommodation, it may be necessary for an employer and the employee to engage in an "informal, interactive process" to determine whether and which reasonable accommodations are feasible. *See* 29 C.F.R. § 1630.2(o)(3); *cf. Willis*, 108 F.3d at 284 (holding there is no violation of the ADA merely for failing to investigate, absent evidence of a reasonable accommodation). An employer may require a medical examination in order to ascertain reasonable accommodations. 29 C.F.R. pt. 1630, App. 1630.14(c).[15]

It appears from the record that Plaintiff first mentioned his problem to Ms. Kaipainen on or around April 30, 2004, when she noted that he had exceeded his break by 15 minutes. (Kaipainen Aff. ¶ 5). When Plaintiff stated he had a small bladder, she asked that he obtain medical documentation of his condition to assist in determining proper accommodations. (Kaipainen Aff. ¶ 5; Depo. at 70, ll. 9-13). Plaintiff made an appointment with his primary care physician, Dr. Martinez. (Depo. at 70, l. 23 - 71, l. 3). On July 9, 2004, Plaintiff gave Ms. Haase a note from Dr. Martinez that requested "any consideration you could extend during the time that he is undergoing evaluations before more specific diagnoses are given." (Dep. 236 l. 22 - 238, l. 14; Exh. 40; Haase Aff. ¶ 7). Ms. Haase told Plaintiff the note was too general and was not helpful in suggesting reasonable accommodations because it did not suggest specific time frames for additional breaks or other accommodations. (Haase Aff. ¶ 7). Ms. Haase contends that she did not feel any more equipped to provide Plaintiff with reasonable accommodations because of the lack of specificity.

---

[15] 29 C.F.R. § 1630.14 provides: "A covered entity may require a medical examination (and/or inquiry) of an employee that is job-related and consistent with business necessity. A covered entity may make inquiries into the ability of an employee to perform job-related functions." Plaintiff has not challenged Defendant's request for additional medical information.

*Id.*[16]

However, on August 6, 2004, Plaintiff did provide Ms. Haase a note from his urologist, Dr. Tirney, which she admits was sufficiently specific. (Haase Aff. ¶ 9).   It requested that Plaintiff receive breaks to use the restroom every hour and a half to two hours.   *Id.*   Defendant does not dispute that it was obligated, once in possession of this information, to accommodate Plaintiff.   Ms. Haase alleges that she emailed Ms. Kaipainen and another Human Resources representative, but that an insufficient amount of time existed for the company to implement changes before Plaintiff was fired on August 12, 2004.   (Haase Aff. ¶ 10).   The Court finds that under the circumstances, Defendant's delay of four working days was not unreasonable.   *Cf. Terrell*, 132 F.3d at 628 (delay of three months in implementing accommodation was reasonable).

The Court acknowledges that in many cases, as the Fifth Circuit has noted,

> the employee continues working in a capacity arguably needing accommodation while the interactive process is ongoing. An employer that dragged its feet in that situation could force the employee to work under suboptimal conditions, "simply document the employee's failures," and use the employee's difficulties as an excuse to terminate her. An employer's delaying of the process under those conditions might create liability.

*Loulseged v. Akzo Nobel Inc.*, 178 F.3d 731, 737 (5th Cir. 1999) (internal citations omitted).   On the other hand, the employer's "duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made." *Gaston v. Bellingrath Gardens & Home, Inc.,* 167 F.3d 1361, 1363 (11th Cir.1999).   It does not appear from the record evidence that either party requested or suggested a specific accommodation while Plaintiff was waiting to be seen by Dr. Tirney.   It is also undisputed that Plaintiff was ultimately terminated for a number of reasons

---

[16] Even had this note been interpreted as a request to take breaks at any time, this would not have been a reasonable accommodation. *See Earl v. Mervyns, Inc.*, 207 F.3d 1361, 1367 (11th Cir. 2000) (finding that a request to arrive at work at any time, without reprimand, was not a reasonable accommodation).

unrelated to his excessive break times.  And there is no evidence that Defendant unduly delayed in implementing any accommodations; rather, it was waiting on Plaintiff to supply some specific, reasonable request for an accommodation.   Because Plaintiff did not request a specific accommodation before August 6, 2004, and because Defendant's delay in implementing the request was not unreasonable under the circumstances, Defendant's motion for summary judgment on Plaintiff's failure to accommodate claim is accordingly granted.

### *Conclusion*

As set forth above, Plaintiff has failed to present a prima facie case of disability discrimination, and Defendant has presented a legitimate non-discriminatory reason for Plaintiff's firing, which Plaintiff has not demonstrated is pretextual.  Upon consideration, it is

**ORDERED** and **ADJUDGED** that

1)      Defendant's Motion for Summary Judgment (Dkt. 22) is **GRANTED**;

2)      All other pending motions are **DENIED** as moot;[17]

3)      The Clerk is directed to close the case.

**DONE AND ORDERED** in chambers this _22nd_ day of January, 2007.

**JAMES D. WHITTEMORE**
**United States District Judge**

Copies to:
Counsel of Record

---

[17] Defendant's motion to strike (Dkt. 30) is addressed in a separate order.